[No. 26534.    Department Two.    January 3, 1938.]

*In the Matter of the Guardianship of* GRANT KELLEY *et al., Minors.*

ALBERT KELLEY, *Respondent,* v. H. F. KELLEY *et al., Appellants.*[1]

[1]Reported in 74 P. (2d) 904.

110

*Ott & Cross* and *Jas. A. Williams,* for appellants.

*Cannon, McKevitt & Fraser* and *Albert J. Galen* (*Frank J. Blade,* of counsel), for respondent.

ROBINSON, J.—This case illustrates one of the many weak spots in our system of administration of guardianship estates. It is further typical of a class of cases which have become so regrettably familiar as to seriously challenge the attention of both bench and bar.

A wife dies intestate, leaving minor children who become entitled to a portion of her community share. Their father becomes their guardian. Long accustomed to the unrestricted management of the community property and unfamiliar with legal concepts, he does not realize his responsibility as a trustee of the children's portion; or, if he does dimly realize it, when he is brought face to face with what seems to him a golden opportunity, but one requiring the employment of every financial resource at his command, he uses the trust fund in the sincere belief that whatever technical breach may be committed will be atoned for by the certain doubling or trebling of his wards' estate. When the investment fails and the children arrive at majority, they summon their father into court to account.

In some of the cases, as in this, the father has treated his wards with such affectionate consideration and liberality that it is difficult to regard a suit against the father as anything other than ungrateful. But a sound public policy requires that little or no remedial distinction be made between breaches of trust which are deliberate and intentional and those which are well-intentioned or which, for some other reason, may be thought to be somewhat excusable. The effect on the ward's estate is the same in either case, and, if he brings suit, he is entitled to recover.

The wife of H. F. Kelley died in 1918, leaving three minor sons, of whom the youngest, Albert Kelley, is the respondent. Upon a settlement of the estate, the respondent was entitled to a one-sixth interest in a section of land in Adams county. Appellant H. F. Kelley was appointed guardian of his three sons. On February 22, 1932, the respondent, Albert Kelley, arrived at the age of twenty-one years, and shortly thereafter demanded an accounting.

None being furnished, this proceeding was instituted

on October 27, 1934, by filing a petition in the guardianship proceedings reciting the appointment of H. F. Kelley as guardian, the giving of a bond of the Fidelity & Deposit Company of Maryland, the petitioner's coming of age, the failure of the guardian to file an account, and alleging that the guardian and the surety were liable in the sum of $2,283.33, with interest and the statutory ten per cent penalty, and praying for an order directing that citation issue requiring the guardian to appear and account, and upon such accounting that judgment be entered against the guardian and his surety for the amount of the alleged liability, with interest, penalty, and costs.

On the same day, an order was made, directing the clerk to issue such citation. On the same day, the clerk issued a citation directed to the guardian and surety requiring them to appear on December 19, 1934,

" . . . then and there to show cause, if any you have, why the order and judgment prayed for in said petition should not be made and entered therein."

The citation and petition were served on the surety on October 29, 1934. No other proceedings were ever instituted, and no summons was issued or served, and the jurisdiction, if any, over the surety was acquired by the issuance and service of the citation.

Appellant Fidelity & Deposit Company appeared specially and contested the jurisdiction of the court by a motion to quash, on the ground that the citation was insufficient to confer jurisdiction so far as it was involved. No immediate hearing was held on this motion to quash, and, in fact, it was not formally passed upon until February 5, 1936, on which date it was denied. In the meantime, however, the guardian filed an account on December 17, 1934, to which the respondent excepted, and a hearing was had in October, 1935, which resulted in the court's ruling that the ward was

entitled to the entire relief demanded. No order or judgment, however, was then entered. Subsequently, in February, 1936, the court having denied the surety's motion to quash, issues were made up between the respondent and the surety; the surety, however, preserving its special appearance. On May 12, 1936, additional evidence was taken, and, the court adhering to its previous announcement, findings of fact, conclusions of law, and judgment were entered against both the guardian and surety for the full relief demanded, and both have appealed.

The most important question raised by the sixteen assignments of error is whether or not the court had jurisdiction to proceed against the surety by citation. The appellant's surety contends that its liability on the bond could only be enforced by a civil action begun by the issuance and service of summons, as provided in Rem. Rev. Stat., § 220 [P. C. § 8432]. It is insisted that there is no provision in the statutes for the entry of money judgments in probate proceedings or for the issuance of execution on such judgments, or provisions for costs, as in a plenary action, and that the probate court is vested only with a limited jurisdiction.

In this connection, appellant relies not only upon the wording of various sections of Remington's Revised Statutes, to-wit, §§ 1371, 1373, 1572, 1575, 1589, and 1590 [P. C. §§ 9929, 9825, 9904, 9907, 9931, 9932], but also upon many cases decided by this court, including *Stewart v. Lohr,* 1 Wash. 341, 25 Pac. 457, 22 Am. St. 150; *Huston v. Becker,* 15 Wash. 586, 47 Pac. 10; *Horton v. Barto,* 17 Wash. 675, 50 Pac. 587; *In re Gorkow's Estate,* 28 Wash. 65, 68 Pac. 174; *In re Decker's Estate,* 105 Wash. 221, 177 Pac. 718; *State ex rel. Brown v. Long,* 180 Wash. 602, 41 P. (2d) 396, and particularly relies on *State ex rel. Nolte v. Superior Court,* 15 Wash. 500, 46 Pac. 1031, and *In re Alfstad's Estate,* 27 Wash. 175, 67

Pac. 593. General statements, such as 28 C. J. 1303, §§ 512 and 513, and 24 C. J. 79, § 498, and 1086, § 2602, are cited, together with a great number of citations from other jurisdictions.

We conclude, from an examination of these authorities, that neither the general statements from Corpus Juris nor the decisions of the courts of other states are helpful, being based upon statutes differing from our own. For the most part, the decisions cited from this court antedate the present probate code, which was enacted in 1917. No cases construing its provisions appear in our reports prior to Volume 100 thereof, and few prior to Volume 112.

The general provisions contained in Rem. Rev. Stat., §§ 1589 and 1590, are very broad indeed. It is declared to be the intention of the probate code that the courts shall have full and ample power to settle all estates of minors, and, if the provision of the code with reference to the administration and settlement of such estates should be insufficient or doubtful, the court should have the authority to proceed in any manner which might seem right and proper; and it is further declared that, in exercising any of its jurisdiction and powers, the court is authorized to make and issue all kinds of orders, judgments, citations, notices, summons, and other processes, not inconsistent with the act, which may be considered proper or necessary in the exercise of such jurisdiction. Furthermore, a superior court sitting in probate loses none of its powers as a court of general jurisdiction. See *State ex rel. Keasal v. Superior Court*, 76 Wash. 291, 136 Pac. 147, expressly overruling *In re Alfstad's Estate, supra.*

It was held in *In re Gardella,* 152 Wash. 250, 277 Pac. 846, that the court may enter judgment against the guardian upon settling his account. We think the surety, upon filing the bond, becomes, in a very real

sense, a party to the guardianship proceedings, and, in effect, consents to the exercise of the broad jurisdiction conferred upon the court, as above stated, and that those sections of the code warrant the court in proceeding against the surety by citation and in entering judgment against the surety, as was done in the case at bar; and we are the more content to so hold because this method of proceeding not only avoids multiplicity of suits, but also gives the surety his day in court in a more real sense than the system for which the appellant surety contends.

This is true because, under that system, a judgment may be entered against the guardian, without notice to the surety, which, in the absence of fraud or collusion, will be conclusive against the surety. *Goodwin v. American Surety Co.,* 190 Wash. 457, 68 P. (2d) 619. Under the procedure followed in this case, the surety is afforded full opportunity to deny the alleged liability of the guardian and to litigate every phase of the question.

The conclusion to which we have come as to this matter also disposes of the assignment based upon the statute of limitations, since it amounts to a holding that this proceeding was instituted at the time of the filing of the petition, followed by immediate service. This was well within the limitation period.

▮ At the first hearing, in which the surety took no part, it appeared, from the oral testimony of the guardian and from the records of the probate of his first wife's estate, including the petition for sale, reappraisement, return of sale, and order of confirmation, that the Adams county land was sold for cash, and for a sum which fixed the respondent's share at $2,283.33. At the later hearing, the surety called the purchaser, who testified that he could not recall paying cash, but, according to his recollection, the land was in some way

paid for by the delivery of shares in the Kelley Ranch Company. This version of the transaction was supported by the evidence of the second Mrs. Kelley and, at the second hearing, by Kelley himself. The court found that the guardian had received cash.

As far as the recovery against the guardian is concerned, the question as to whether cash was received or whether he merely turned in the land in payment for Kelley ranch stock is immaterial. As to the surety, however, the finding is material, since it bears upon the remedy. However, in view of the recitals in the probate record, and bearing in mind that the court saw and heard some of the witnesses, we feel that we cannot disturb this finding.

· At the time of the death of respondent's mother, appellant Kelley was farming about ten or twelve thousand acres of leased wheat land in Washington. Kelley testified that, in 1921, he invested the $6,850 received from the Adams county land, together with other property, in the Kelley ranch in Montana. It was incorporated for one million dollars, in shares having a par value of one dollar each, of which he eventually acquired 331,000 shares. At its peak, the corporation operated about 96,000 acres, and, at times, had as many as 18,000 sheep, 3,500 cattle, and 500 horses. During the haying season, it employed from one hundred to one hundred twenty hands.

Neither the corporation nor Kelley himself was in as affluent circumstances as these figures might indicate. Kelley was indebted personally on his stock in the sum of $270,000, and the company itself owed between seven hundred and eight hundred thousand dollars. The venture was never prosperous, and, during the period that the respondent was under guardianship, went fairly steadily from bad to worse. It paid no dividends, and Kelley's salary as manager, which was ten thou-

sand dollars per year, was not always paid in full. In 1930, it had dwindled to one thousand dollars; in 1931, he received sixteen hundred dollars, and in 1932, he received nothing at all. It appears from the evidence that during the guardianship period, except, perhaps, the first few years thereof, Kelley was fairly hard-pressed, and at times, particularly during the latter years, seriously so. Yet, there is evidence that, in some way, he managed to keep up appearances not altogether inconsistent with the vast undertaking which he directed.

For a time, the lives of the three boys were insured for twenty-five thousand dollars each, although these policies were cashed for twenty thousand dollars in time of need. In his account filed on December 17, 1934, he claimed to have spent on respondent's behalf a great deal more than the $2,283.33 which he had received.

It is impossible to go into the particulars of this account. The chief items, which we give in more or less round figures, are approximately as follows: Two hundred thirty dollars for tuition and board at the Deaconess School, Helena, Montana, in 1923; more than one thousand dollars for tuition and board at Hill's Military Academy in 1924; seven or eight hundred dollars for room and board while attending Powell county high school from 1924 to 1928; about twelve hundred dollars for various expenses while maintaining the respondent at Montana State College and Montana State University; about seven hundred dollars for cattle, given to the respondent when he was about twenty years of age. In addition to these, there were a number of miscellaneous items for music lessons, clothing, doctors' bills, and cash.

According to the account, the guardian had expended the entire $2,283.33 belonging to the respondent by

July, 1927, and exceeded it by the amount of $3,388.04 by the time the respondent reached his majority, excluding cash items, for which he had no record, estimated at two thousand dollars. In addition, the guardian paid the respondent a salary for the work he did on the ranch. The respondent testified that many of these expenditures were outright gifts; that some were not chargeable to him, but to his brothers; and insisted that he never knew they were being made out of his share of the estate.

The trial court found, and we agree with him, that the bulk, at least, of these expenditures were actually made. He also found, and again we agree, that, looking at the matter in retrospect, they were more than the father's duty required him to make under the circumstances. He also gave it as his opinion that, if the venture had turned out well, Mr. Kelley would not have thought of charging them against the guardianship estate, which we also think more than probable.

We may add that we also believe from the evidence that the expenditures would have been made by Mr. Kelley if he had had no guardianship fund in his hands. They were not at all out of keeping with his way of living. The court believed, however, that the ward was not informed that his property was being used for the purposes indicated, and that the probate court was not consulted, and it is certain that the guardian never opened a guardianship account or made any report from the time he qualified in 1918 until he was forced to do so in December, 1934.

In the ordinary guardianship accounting, the question presented would be: Was the guardian justified in using the fund to defray these educational and other expenses? In many such cases, the questioned expenditures were made on advice of counsel, or even on orders of the court. Here, the situation is somewhat

different. These expenditures were not so made. In fact, they were not even made out of a fund. No fund existed after 1921. The guardian at that time converted it to his own use, and he now asks the court to hold that he has repaid the respondent by furnishing him better educational opportunities and more cash, etc., than his legal duty as a parent required him to furnish. That is to say, he confesses the misappropriation and pleads repayment. We agree with the trial court that, under all the circumstances, the expenditures in question should not be held to constitute a repayment.

It is assigned that the court erred in imposing the penalty provided in Rem. Rev. Stat., § 1575 [P. C. § 9907], subd. 3. Since this case was argued, that statutory provision has been held unconstitutional and void—*In re Deming*, 192 Wash. 190, 73 P. (2d) 764.

The appellant's surety also contends that, since its bond was not filed and executed until the fourth day of November, 1931, and by its terms the surety engaged to protect the minors against the losses of any property which "may come into the hands or possession of such guardian," and since it appears that the guardian misappropriated the money prior to that date, it is, therefore, not bound. We think, however, that the bond covers misappropriations which occurred prior to its execution. *Owens v. McMahan*, 122 Wash. 191, 210 Pac. 200; *Wilkins v. Deal*, 128 Neb. 78, 257 N. W. 486. The bond contains internal evidence that it was filed expressly to protect the respondent and his brothers with regard to the sale of the Adams county land. We quote from it briefly, as follows:

"The condition of this obligation is such that, if the above named principal H. F. Kelley, who has been appointed guardian for the sale of real estate for Grant Kelley, Melvin Kelley, and Albert Kelley, shall

faithfully discharge the office and trust of such guardian according to law, . . ."

There had been a prior general bond filed in the guardianship estate in the amount of two thousand dollars, upon which William Snyder and G. W. Bassett were sureties. Appellant surety moved that the respondent be required to make these sureties additional defendants. This motion was denied by the court, and that denial is assigned as error. We think that the respondent had a right to elect to proceed against the second bond only, and that the court could not properly force him to include the sureties on the other bond. To have granted this motion would have had that effect.

It is also assigned as error that the court erred in refusing to allow the guardian any fees. This matter was within the court's discretion, and, in our opinion, that discretion was properly exercised. But we think that the appellants are correct in saying that certain expenses of administration should be allowed. The record shows that the guardian paid a guardian *ad litem* fifteen dollars, and paid his attorney in the guardianship proceedings one hundred dollars for services rendered in connection with the sale of the land. It also appears in evidence that the guardian paid premiums on the bond amounting to $223.27, and is still liable for $106.65 on that account. We think the principal amount for which the guardian should be charged is $2,245, which is arrived at by deducting from $2,283.33 one-third of the amount of the attorney's fees above mentioned. The penalty assessed against the guardian must also be disallowed. We think also that appellants are entitled to some kind of credit with respect to one-third of the bond premiums paid by the guardian or for which he remains liable.

The judgment and decree appealed from is modified to the extent that the recovery against the appellants shall be as follows: (1) For the principal sum of $2,245, together with interest thereon at the rate of six per cent per annum from the 4th day of November, 1921; (2) For taxable costs in the sum of $47.36; said entire recovery, however, to be diminished by the sum of $109.97, the same being one-third of the bond premiums. We appreciate that this requires the appellants to pay some interest on the amount last mentioned, which they should not be required to pay, but this is due to the fact that they have failed to furnish the data which would enable us to make the calculation, and the amount is so small that we assume that they would prefer to pay it rather than to have the case reopened for the purpose of proving when the various payments with respect to bond premiums were made.

STEINERT, C. J., and BEALS, J., concur.

HOLCOMB, J. (dissenting)—For the reasons stated by the dissenters in *In re Deming*, 192 Wash. 190, 73 P. (2d) 764, I dissent from so much of the prevailing opinion as decides that Rem. Rev. Stat., § 1575, subd. 3, is unconstitutional and void.